UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Stephen Michaels LLC,

      Plaintiff,

v.                                                    Honorable Sean F. Cox

American Suzuki Motor Corporation,                    Case No. 11-10678

      Defendant.

_____/

## OPINION & ORDER

      This case involves a dispute between the parties to an automotive dealer agreement.  On

June 23, 2005, Plaintiff and Defendant entered into a dealer agreement that is governed by the

Michigan Dealer Act, M.C.L. § 445.1561 *et seq*.  After Defendant notified Plaintiff that it was

terminating that dealer agreement, Plaintiff filed this action.  Plaintiff asks this Court to

determine the parties's contractual rights, award it damages and attorney fees, and issue an

injunction preventing Defendant from terminating the dealer agreement.  Defendant has since

asserted a breach of contract counterclaim, alleging that Plaintiff has breached several sections of

the agreement, thereby allowing Defendant to terminate the agreement, and that Plaintiff has

failed to de-brand following notice of termination.  The matter is currently before the Court on

Defendant's Motion for Summary Judgment.  The parties fully briefed the issues and the Court

heard oral argument on December 8, 2011.  For the reasons that follow, the Court shall GRANT

THE MOTION IN PART AND DENY THE MOTION IN PART.  The Court shall GRANT the

motion to the extent that the Court shall grant summary judgment in Defendant's favor as to

Plaintiff's claims for monetary damages.  The Court shall DENY the motion in all other respects.

In addition, because Plaintiff's remaining claims seek only equitable relief, the Court shall STRIKE Plaintiff's jury demand.

## BACKGROUND

Plaintiff Stephen Michaels LLC d/b/a Consumers Suzuki ("Plaintiff" or "Consumers") is a business in Brighton, Michigan that sells and services motor vehicles.

Plaintiff filed this action against Defendant American Suzuki Motor Corporation ("Defendant" or "ASMC") in state court on or about January 13, 2011, which Defendant removed to this Court on February 18, 2011. Plaintiff's Amended Complaint alleges that the parties entered into a Dealer Sales and Service Agreement on June 23, 2005. (Pl.'s Am. Compl., D.E. No. 14, at ¶ 3). Plaintiff brings this action pursuant to the Michigan Dealer Act, M.C.L. § 445.1561 *et seq.*, asserting two counts against Defendant. Plaintiff's Amended Complaint includes a jury demand. (D.E. 14 at 4).

Count I, "Declaratory Judgment and Damages Pursuant to MCL 445.1580," alleges that "Defendant has breached the Agreement" and attempted to "terminate the Agreement without good cause." (*Id.* at ¶¶ 11-12). With respect to Count I, Plaintiff requests that this Court determine the contractual rights of Plaintiff and Defendant, and award damages and attorney fees incurred by Plaintiff as a result of Defendant's breach." (*Id.* at ¶ 14).

Count II, ""Injunction Pursuant to MCL 445.1581," states that M.C.L. § 445.1581 "allows injunctive relief against the termination of Agreement, without bond" and requests "a temporary injunction preventing Defendant from terminating the Agreement pending the resolution of this case, and that this Court issue a permanent injunction in its final Order." (*Id.* at

¶ 16 & 19).[1]

Defendant has asserted a breach of contract counterclaim, alleging that Plaintiff has breached several sections of the agreement, thereby allowing Defendant to terminate the agreement, and that Plaintiff has failed to de-brand following notice of termination. (D.E. No. 4). Defendant seeks breach of contract damages, attorney fees as provided under the dealer agreement, and injunctive relief regarding de-branding. Defendant demanded a jury trial as to its counterclaim.

Discovery in this matter closed on June 22, 2011, and the Scheduling Order provides that all motions were to be filed by July 22, 2011. (D.E. No. 13).

On July 22, 2011, Defendant filed the instant Motion for Summary Judgment, wherein Defendant asks this Court to: 1) grant summary judgment in favor of Defendant as to Plaintiff's claims; and 2) grant partial summary judgment as to its breach of contract counterclaim, as to liability only. (D.E. No. 35).

This Court's practice guidelines for motions for summary judgment provide, in pertinent part, that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement,

---

[1]Plaintiff also filed a Motion for Preliminary Injunction, but that motion was later withdrawn after the parties agreed to maintain the status quo during the pendency of this action. (*See* D.E. Nos. 8 & 34).

whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

Along with Defendant's Motion for Summary Judgment, Defendant filed a "Statement of Material Facts Not In Dispute" that follows this Court's practice guidelines.  Along with Plaintiff's Response, Plaintiff filed its "Counter Statement of Disputed Facts."  Plaintiff's statement, however, does not follow this Court's practice guidelines as it does not respond to each paragraph individually.  Instead, Plaintiff groups together numerous paragraphs of Defendant's statements and responds with arguments and/or by citing deposition testimony regarding numerous issues.

The following material facts are gleaned from the parties' statements and the evidence submitted by the parties, taken in the light most favorable to Plaintiff.

Plaintiff and Defendant entered into a dealership agreement on June 23, 2005.  (Def.'s Stmt. at ¶ A(1); Pl.'s Stmt. at ¶ A(1)).  The dealership agreement governed the relationship between Plaintiff and Defendant.  (Def.'s Stmt. at ¶ A(2); Pl.'s Stmt. at ¶ A(2)).  The dealership agreement consists of a written "Suzuki Automotive Dealer Agreement" (the "Dealer Agreement") that then incorporates Standard Provisions and several attachments:

## 5.  INCORPORATION OF THE STANDARD PROVISIONS AND ATTACHMENTS TO THE AGREEMENT

Dealer acknowledges and agrees that the Standard Provisions, the Suzuki Vehicles Addendum (Attachment "A" hereto), the Facilities Standard Addendum (Attachment "B" hereto), the Dealer Minimum Standards Addendum (Attachment

4

"C" hereto), and the Sales Department and Service Department Commitment (Attachment "D" hereto) are incorporated in this Agreement and shall be deemed a part of this Agreement (collectively, the "Incorporated Documents").  Without limiting any other provisions of this Agreement, Dealer shall comply with, and otherwise perform, the requirements and obligations set forth in the Incorporated Documents.

(Def.'s Ex. C-2) (bolding in original).

**Contractual Requirements Regarding Service Technicians**

The Dealer Agreement requires Consumers, among other things, to "[c]omplete and maintain a minimum of two (2) Suzuki trained technicians who have been certified by the Suzuki Service School" during the term of the agreement.  (Dealer Agreement at ¶ 6).  Attachments to the Dealer Agreement and the Dealer Agreement's Standard Provisions also confirm that requirement.  Attachment C to the Dealer Agreement, titled "Dealer Minimum Standards Addendum" also states that Consumers was to employ a minimum of two Technicians. (Attachment C to Dealer Agreement).  Attachment D to the Dealer Agreement, titled "Sales Department & Service Department Commitment," states, in pertinent part:

> Customer satisfaction is critical to the success of Suzuki and is a high priority in the Suzuki organization.  To support a high level of customer satisfaction, the dealer agrees to provide and maintain the following:
> . . . .
> •     Technician Requirements:
>       ⇨ Two (2) technicians trained in required classes.  (See current requirements)

(Attachment D to Dealer Agreement).  The Standard Provisions to the Dealer Agreement provide, in pertinent part:

> **9.7 Service Personnel**.  Dealer agrees to maintain an adequate service and parts organization as recommended by Suzuki, including a competent, trained service and parts manager(s), trained service and parts personnel and, where service volume or other conditions make it advisable, a consumer relations manager.

5

Service personnel in the dealership shall be competent and properly trained at Dealer's expense to handle all service work of Dealer's customers. *Dealer shall have at least two full-time technicians who have been certified by the Suzuki Service School, and more than two full-time technicians if the service department volume warrants additional mechanics.* Dealer shall send its dealer personnel to service training classes, service schools and clinics, technical training school, seminars and other dealer employee training courses as provided by Suzuki from time to time, including all of Suzuki's Technical Training Programs, and Dealer shall ensure that its technicians also participate in all video training and testing programs (including the Mechanic to Mechanic series). Dealer acknowledges the need for such school and training to keep current on all Suzuki Vehicles for the protection of Dealer's customers, and agrees to support its service department personnel with respect thereto.

(Standard Provisions to Dealer Agreement at ¶ 9.7) (bolding in original, italics added for

emphasis).

## Contractual Requirements Regarding Service Tools

The Standard Provisions to the Dealer Agreement contain the following paragraph, that

relates to tools and equipment:

**9.8 Tools and Equipment**. *Dealer agrees to provide and maintain on Dealership Premises essential service tools as required by Suzuki,* and such other tools and equipment as reasonably necessary to fulfill its responsibilities to properly diagnose and service Products, Dealer also agrees to allow Suzuki or its designated representative to survey or inspect Dealer's tools and equipment to ensure that they are in good repair and proper calibration to enable Dealer to meets its service responsibilities. In the event a dispute arises from such a survey or inspection, Suzuki personnel agree to discuss the matter with the Dealer in order to resolve the dispute.

(Standard Provisions to Dealer Agreement at ¶ 9.8) (bolding in original, italics added for

emphasis).

## Contractual Requirements Regarding Submission Of Financial Statements

The Dealer Agreement requires of Consumers "[m]onthly submission of Suzuki financial

6

statements <u>ELECTRONICALLY VIA SCAT</u> due the 10th of the following month." (Dealer

Agreement at ¶ 6) (Capitalization and underlining in original).  The Standard Provisions to the

Dealer Agreement provide:

> **12.4 Uniform Accounting System**.  A uniform accounting system facilitates an evaluation of Dealer business management practices and the impact of Suzuki policies and practices.  Suzuki therefore agrees to maintain, and Dealer agrees to use and maintain records in accordance with a uniform accounting system set forth in the Suzuki Standard Accounting Manual furnished to Dealer.  Dealer *further agrees to electronically submit to Suzuki, by the tenth business day of every month, dealer financial data, including but not limited to financial statements and supporting schedules, in a manner specified by Suzuki* and on a timely basis.

(Standard Provisions to Dealer Agreement at ¶ 12.4) (bolding in original, italics added for

emphasis).

**Termination Provisions**

The Standard Provisions to Dealer Agreement provide several paragraphs that allow

either Suzuki or the Dealer to terminate the Dealer Agreement under specified circumstances.

Those termination provisions include:

> **Section 13.2 Termination by Suzuki for Dealer Failure of Performance.**  If Suzuki determines that Dealer's Premises are not in compliance with Suzuki's written standards, or that Dealer has failed to adequately perform its sales or service responsibilities, including those responsibilities relating to customer satisfaction and training, Suzuki will review such failure with Dealer.
>       As soon as practical thereafter, Suzuki will notify Dealer in writing or electronically of the nature of Dealer's failure and of the period of time during which Dealer will have the opportunity to correct the failure.
>       If Dealer does correct the failure by the expiration of the period, Suzuki will so advise the Dealer in writing or electronically.  If, however, Dealer remains in material breach of its obligations at the expiration of the period, Suzuki may terminate this Agreement by giving Dealer 60 days advance written notice.

(Standard Provisions to Dealer Agreement at ¶ 13.2) (Bolding in original).

Section 13.3 allows Suzuki to terminate the Dealer Agreement after the occurrence of

7

several enumerated events, including "[r]efusal by Dealer to timely furnish sales, service or financial information and related supporting data."  (Standard Provisions to Dealer Agreement at ¶ 13.3(f)).

**Other Contractual Provisions**

The Dealer Agreement also contains numerous provisions regarding the use of Defendant's trademarks and the actions that must be taken by the Dealer upon termination or expiration of the Dealer Agreement.  (*See* Standard Provisions to Dealer Agreement ¶¶ 5.1, 5.2, 5.3 & 5.4).  In sum, Paragraph 5.3 requires the dealer to "de-brand" (discontinue use of Suzuki marks, remove signage, etc.) upon termination or expiration of the Dealer Agreement.  The Dealer Agreement also provides for equitable remedies concerning de-branding and provides that "Dealer agrees that it shall reimburse Suzuki for any costs and expenses incurred in the removal of signs owned by Dealer bearing the Suzuki Marks, including reasonable attorneys' fees."  (*Id*. at ¶ 5.4).  The Dealer Agreement also provides that "[i]n any action, proceeding or dispute arising in connection with any alleged breach of this Agreement or otherwise relating in any way to this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs."  (*Id*. at ¶ 16.10).

**Chronology Of Relevant Events**

After signing the Dealer Agreement, Consumers opened its Suzuki dealership in Brighton, Michigan in 2005.  (Def.'s Stmt. at ¶ A(3); Pl.'s Stmt. at ¶ A(3)).  Michael Cizmar is the managing and sole member of Plaintiff and manages the day-to-day operations of Consumers Suzuki.  (Cizmar Dep. at 7-8).

On December 15, 2009, Defendant sent Plaintiff a letter stating that "the special tools that

8

are required in order to receive and work on" a new Suzuki vehicle called the Kizaski "are scheduled to be shipped within a few weeks. Unfortunately, your dealership is currently on COD and as such we are unable to ship you the tools without payment in advance. Please correct your COD status or provide Certified Funds by Friday, 12/18/2009." (Def.'s Ex. A-9). After a representative of Defendant contacted Cizmar about his account status, Cizmar responded in an e-mail stating: "If I pay this they will send me the $3000+ of bullshit 'required' tools and add it to the account. I would prefer to stay COD." (Def.'s Ex. A-10). After Defendant's representative stated, "Mike, Suzuki special tools are required to being a franchised dealer," Cizmar replied:

> I have a battery charger and am fine not being able to submit claims for battery/electrical claims, as a result of not having a $3000 battery tester. We had similar charges for the Equator and have NEVER had an Equater in for service.

(*Id.*).

Fred Dresser was Defendant's Senior District Operations Manager and, at all relevant times, Plaintiff's dealership was assigned to him. (Dresser Dep. at 5-8). On January 29, 2010, Dresser sent Plaintiff a copy of a "January 2010 Dealer Contact Report" for Consumers Suzuki. (Def.'s Ex. B-1). That report reflected that while financial statements were required to be submitted during the prior three months, no financial statements had been submitted by Plaintiff. (*Id.* at 1). In a portion of the report for "Noted Deficiencies," the report stated "Dealer has no trained technicians. Dealer has elected to stay on COD to avoid accepting required special tools." The report further stated, in the "Additional Comments" section:

> 1/29/10: telephone conversation with Mike Cizmar (Dlr Principal): inquired to dealer as to his plans moving forward. Asked dealer if he was going to remain a Suzuki dealer or did he want us to shop the franchise. Dealer responded that his intention is to remain a Suzuki dealer Addressed the technician training area and

dealer advised that why should he send technicians to training if he was not going to get the new product (Kizaski). Advised dealer again that without accepting the special tools he puts himself in a position that regional management would probably send him a letter asking for an action plan and what his commitment is to the franchise. Dealer brought up the fact that Suzuki will not let him advertise in the way that works best for him. Dealer advised that there is no local paper, TV or Radio Stations. Dealer advertising consists of handouts (pens, etc) at local establishments and Suzuki will not pay for.

(*Id.* at 5).

On February 9, 2010, Dresser sent Plaintiff a copy of a "February 2010 Dealer Contact Report" for Consumers Suzuki. (Def.'s Ex. B-2).

On February 9, 2010, Defendant sent Plaintiff, via certified mail directed to Michael Cizmar, a notice of failure of performance letter. (Def.'s Ex. A-7). The subject line of that letter read: "**NOTICE OF FAILURE OF PERFORMANCE PURSUANT TO MICH. COMP. LAWS § 445.1567(3) AND YOUR SUZUKI DEALER AGREEMENT**." (*Id.*) (Bolding and capitalization in original). The body of the later stated, in pertinent part:

> Pursuant to <u>Mich. Comp. Laws § 445.1567(3),</u> and in accordance with Section 13.2 of the Standard Provisions to the Agreement, ACMC hereby notifies you of your failures of performance. Please take further notice, you have 180 days from receipt of this letter to correct the failures of performance of the Agreement set forth below.

> In Section 9.8 of the Standard Provisions to the Agreement entitled Tools and Equipment, Consumers agreed to " . . . provide and maintain on Dealership Premises essential service tools as required by Suzuki, and such other tools and equipment as reasonably necessary to fulfill its responsibilities to properly diagnose and service Products. . ." *Consumers refused to accept delivery of Special Tools related to Suzuki's new vehicle, the Kizashi.*

> In Section 12.4 of the Standard Provisions to the Agreement entitled Uniform Accounting System, Consumers agreed to ". . . electronically submit to Suzuki, by the tenth business day of every month, dealer financial data, including but not limited to financial statements and supporting schedules, in a manner specified by Suzuki and on a timely basis." *Consumers has not submitted financial statements electronically to Suzuki for 10 months.*

10

> In Section 9.7 of the Standard Provisions to the Agreement entitled Service
> Personnel, Consumer agreed to ". . . maintain an adequate service and parts
> organization as recommended by Suzuki, including a competent, trained service
> and parts manager(s), trained service and parts personnel and, where service
> volume or other conditions make it advisable, a consumer relations manager."
> *Consumers does not have any fully trained technicians to service owners of*
> *Suzuki products at this time.*

(*Id.*) (Bolding, underlining & italics in original).  It is undisputed that Cizmar received the

February 9, 2010 letter.  (Cizmar Dep. at 37-38).

On February 16, 2010, Cizar met with Dresser and discussed the three areas of concern,

and other issues.  (Def.'s Ex. B-3).

On March 16, 2010, Dresser sent Plaintiff a copy of a "March 2010 Dealer Contact

Report" for Consumers Suzuki.  (Def.'s Ex. B-4).  That report stated, in a section titled "Noted

Deficiencies:"

> Dealer has not submitted a financial statement for eleven months.  Dealer has no
> new vehicle inventory.  Dealer has not responded to vehicle allocations provided
> to him for February and March.  Dealer Technicians have only completed eight
> on line courses each and have not attended instructor LED classes for the Suzuki
> product especially the new Kizashi.

(*Id.*).

On April 15, 2010, Dresser sent Plaintiff a copy of a "April 2010 Dealer Contact Report"

for Consumers Suzuki that reported the same deficiencies.  (Def.'s Ex. B-5).

On May 18, 2010, Dresser sent Plaintiff a copy of a "January 2010 Dealer Contact

Report" for Consumers Suzuki.  (Def.'s Ex. B-6).  That report stated: "5/18/10 report emailed to

dealer.  Dealer continues to remain COD to avoid purchasing the tools required to perform

service on Suzuki products.  Dealer has failed to comply with the requirements stipulated in the

February 9th letter outlining dealer deficiencies relevant to the Suzuki dealer service and sales

11

agreement." (*Id*.).

On June 21, 2010, Dresser sent Plaintiff a copy of a "January 2010 Dealer Contact Report" for Consumers Suzuki, which stated: "6/21/10 report emailed to dealer. Dealer received letter dated February 9th detailing dealer deficiencies and expected time frame for dealer to correct the deficiencies. As of this date, dealer has not corrected any of the deficiencies stipulated in the letter." (Def.'s Ex. B-7).

On July 13, 2010, Cizar met with Dresser and discussed the three areas of concern, and other issues. (Def.'s Ex. B-8).

On August 25, 2010, Dresser sent Plaintiff a copy of a "August 2010 Dealer Contact Report" that stated: "8/20/10 Report emailed to dealer. As of this date dealer has not complied with the corrective actions spelled out in the 180 day letter dated February 9, 2010." (Def.'s Ex. B-9).

On September 15, 2010, Defendant sent Plaintiff, via certified mail directed to Michael Cizmar, a notice of termination. (Def.'s Ex. A-6). That letter stated that Defendant was terminating the Dealer Agreement "due to Consumers Suzuki's failure to remedy any and all of the failures of performance set forth in the Performance Failure Notice." (*Id*.). That letter further stated:

> To date, Consumers Suzuki has failed to accept or request the shipment of Special Service Tools required by ASMC that were previously rejected. Consumers Suzuki has also failed to submit even a single Financial Statement to ASMC in 2010. Lastly, Consumer's Suzuki has failed to attain even one Suzuki trained technician for the servicing of Suzuki Vehicles.

> Despite your commitments to Fred Dresser, the District Operations Manager for your dealership, that you would resolve the failures when he visited your dealership February 16, 2010, you have failed to do so.

In addition to the above failures for which your Agreement is being terminated, it is also important to note that **you have not ordered a single Suzuki vehicle during the performance period** and currently have no Suzuki inventory.  **You have also reported only one Suzuki retail sale for the entire year of 2010.**

Therefore, pursuant to <u>MICH. COMP. LAWS § 445.1570</u> and in accordance with the Agreement, ASMC hereby provides notice of its intent to terminate Consumer Suzuki's Agreement effective ninety (90) days following receipt of this notice or December 16, 2010 whichever occurs last.

(Def.'s Ex. A-6) (Bolding and underlining in original).

On September 16, 2010, Dresser sent Plaintiff a copy of a "September 2010 Dealer Contact Report" for Consumers Suzuki that stated: "9/16/10 Report emailed to dealer. Termination letter from corporate office mailed to dealer on September 15."  (Def.'s Ex. B-10).

On September 29, 2010, Defendant sent Plaintiff a letter signed by Frank Wisnoiwiciz and another representative of Defendant that stated, in pertinent part:

. . . Each dealership is required to employ 2 fully trained service technicians in all courses provided by ASMC, both OLT and ILT.
According to the attached report, your Dealership does not have 2 fully trained technicians in OLT and ILT.  ASMC is giving you the opportunity to rectify this deficiency by January 31, 2011.

(Ex. 3 to Pl.'s Resp.).  That letter then went on to provide information regarding available classes.

On November 12, 2010, Dresser sent Plaintiff a copy of a "November 2010 Dealer Contact Report" for Consumers Suzuki that stated: "11/12/10 Dealer has not complied with the terms specified in the letter sent to dealer on February 9, 2010.  Dealer termination date is December 16.  Report emailed to dealer."  (Def.'s Ex. B-11).

On November 16, 2010, Cizmar sent a letter to Defendant stating that Plaintiff had received notice of Defendant's intent to terminate the Dealer Agreement and that Plaintiff does

13

not believe that it is in violation of the agreement.  (Def.'s Ex.  A-5).

On December 3, 2010, Defendant sent Plaintiff a letter responding to Cizmar's

November 16, 2010 letter.  (Def.'s Ex. A-8).

**Standard of Decision**

Summary judgment is proper when there are no genuine issues of material fact in dispute

and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  In

deciding a motion for summary judgment, the court must view the evidence and draw all

reasonable inferences in favor of the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp*., 475 U.S. 574, 587 (1986).

## ANALYSIS

### I.    Plaintiff's Claims Under The Michigan Dealer Act

The Michigan Dealer Act "regulates the relationship between automobile manufacturers

and automobile dealers."  *Fred Lavery Co. v. Nissan North America, Inc*., 99 Fed.Appx. 585,

588 (6th Cir. 2004).  "Among many other requirements, the Act places limitations on a

manufacturer's authority to terminate a dealership agreement."  *Id.*  Under M.C.L. §

445.1567(1), a manufacturer may not cancel or terminate a dealer agreement unless it has: 1)

satisfied the notice requirements of M.C.L. § 445.1570; 2) "[a]cted in good faith;" and 3) has

"good cause" for the cancellation or termination of the dealer agreement.  *Fred Lavery Co.*, 99

Fed.Appx. at 588; M.C.L. § 445.1567(1).

Although Plaintiff does not appear to contest that the notice requirements were met,

Defendant, as the manufacturer or distributor, has "the burden of proof for showing that it has

acted in good faith, that the notice requirement has been complied with, and that there was good

14

cause for the termination" or cancellation of the Dealer Agreement. M.C.L. § 445.1569. Thus, the Court will consider each of the above requirements.

### A.    Notice Requirements

Under M.C.L. § 445.1570, prior to terminating Plaintiff's Dealer Agreement, Defendant was required to furnish notice of the termination: 1) "not less than 90 days prior to the effective date of the termination,"; 2) by certified mail to the dealer; 3) in a mailing containing a statement of intention terminate the agreement, a statement of reasons for the termination, and the date on which the termination takes effect.

Defendant contends that it satisfied those requirements by having sent Plaintiff the February 9, 2010 Notice of Failure of Performance letter and the Notice of Termination letter on September 15, 2010. The Court agrees.

### B.    Good Faith

Next, the Michigan Dealer Act requires the manufacturer to "act in good faith," which means "honesty in fact and the observation of reasonable commercial standards of fair dealing in the trade." *Fred Lavery Co.*, 99 Fed.Appx. at 590; M.C.L. § 445.1564(1).

The issue of good faith "is ordinarily 'a matter of factual weighing' for the district court in a bench trial." *Fred Lavery Co.*, 99 Fed.Appx. at 591.

Here, Plaintiff contends that the facts surrounding Defendant's decision to terminate it for not having fully trained service technicians are sufficient to create a genuine issue of material fact as to this issue. Plaintiff contends it was treated differently than other dealers in that other dealers failed to meet the technician requirement but were not terminated and that Plaintiff was the only dealer ever terminated for failing to meet that requirement. Plaintiff also stresses that

15

while Defendant contends that Plaintiff never had fully trained technicians, it did not terminate

the dealer agreement in the previous five years – suggesting that the failure to have fully trained

technicians did not actually motivate the termination.

Plaintiff contends that other dealers failed to meet the technician requirement, but were

not terminated.  Plaintiff directs the Court to Dresser and Wisniowicz's testimony.  Dresser

testified that other dealers have not met the technician requirements:

> Q.    Okay.  Of the 41 dealers that you worked with, did all of them always
>       have fully-trained service techs?
> A.    I would say, no, they did not; but they did have technicians pursuing the
>       online courses and attending the classes.

(Dresser Dep. at 68).

Frank Wisniowicz also testified that, at times, other dealers did not meet the technician

requirement.  Wisniowicz has been Defendant's Regional Service and Technical Manager since

April of 2009.  (Wisniowicz Dep. at 6).  Among other things, he assists "the dealer operation

manager and the other regional managers in the field, as far as service operations for policies and

procedures."  (*Id.*).  He testified as follows:

> Q.    . . . what has your involvement been in this case?
> A.    Very little.  Probably the only thing I can tell you is sending the dealership
>       letters for training deficiency.
> Q.    What do you mean, sending them letters for dealer deficiency?  What does
>       that mean?
> A.    Dealers are required to have trained technicians, and he did not have fully
>       trained technicians.  So what the region does is, the region will send out
>       letters on occasion to notify dealers that they have deficiencies in training,
>       whether they are deficient instructor led or online training, in an effort to
>       get the dealerships trained.
> Q.    Is it common that dealerships don't have fully trained technicians?
> A.    With the change of technicians at dealerships, hiring and firing and
>       moving around, yes, there are occasions that they do not have; and that is

16

> one of the reasons that we send letters, to make sure that they comply to
> the training that Suzuki has.

(Wisniowicz Dep. at 6).

It is undisputed that, during the past five years, Defendant has not terminated any other dealer in Michigan for failing to have fully trained technicians – or for the other two grounds stated for the termination of Plaintiff's Dealer Agreement. (Ex. A to Def.'s Reply Br.)

In addition, Plaintiff stresses that although Defendant contends that Plaintiff never had fully trained technicians since opening the dealership, Defendant did not terminate the dealer agreement in the previous five years – suggesting that the failure to have fully trained technicians did not actually motivate the termination.

Christopher White is Defendant's Senior Manager of Data Development and his duties include overseeing the Suzuki dealer network in general.  (White Dep. at 5-6).  He testified as follows:

> Q.     Mr. White, are you aware of the fact that [Consumers] did not have
>        service techs fully trained for a number of years?
> A.     I was aware that he didn't have trained technicians, certified technicians,
>        at the time of the termination.  I don't know how far back that would go,
>        that situation.
> MR. ALBERTINS: All right. I'm going to give you what has been previously
> marked as Cizmar Exhibit 8, Rogers Exhibit 5.
> . . . .
> Q.     Why did you write, "According to ASMC's records, Consumer's Suzuki
>        has never," underscored, "had a fully trained technician."
> A.     Because our records would indicate that Consumer's Suzuki has never had
>        a fully trained service technician.
> Q.     So why was this issue not raised in 2005?
> A.     I can't answer that.
> Q.     Why was it not raised in 2006?
> A.     Same answer.
> Q.     Why was it not raised in 2007?

17

A.      Same answer.
Q.      Why was it not raised in 2008?
A.      Same answer.
Q.      Why was it not raised in 2009?
A.      Same answer.

(White Dep. at 13-15).

Viewing these facts in the light most favorable to Plaintiff, and given that the Sixth

Circuit has stated that the good faith issue is "is ordinarily 'a matter of factual weighing' for the

district court in a bench trial," the Court finds that a genuine issue of material fact exists as to the

good faith element. *Fred Lavery Co.*, 99 Fed.Appx. at 591. Thus, Plaintiff's Dealer Act claims

shall proceed to trial.

## II.     Defendant's Request For Partial Summary Judgment On Damages & Defendant's Motion To Strike Plaintiff's Exhibit 7

The Act provides that a manufacturer who violates the act is "liable for all damages

sustained by a new motor vehicle dealer as a result of the violation."  M.C.L. § 445.1580(2).  In

addition to requesting that this Court determine the contractual rights of the parties and rule that

the termination was improper, Plaintiff asks that the Court "award damages and attorney fees

incurred by Plaintiff as a result of Defendant's breach." (Pl.'s Am. Compl. at ¶ 14).

In its Motion for Summary Judgment, Defendant contends that even if the Court declines

to grant summary judgment as to Plaintiff's Dealer Act claims, it "should still grant partial

summary judgment on damages because Consumers has no evidence supporting its alleged

damages."  (Def.'s Br. at 15).  Defendant asserts that Plaintiff, like the dealer in *Fred Avery*, has

no evidence that it incurred any damages.

In response to Defendant's Motion for Summary Judgment, Plaintiff attaches, as Exhibit

18

7 to its Brief, an Affidavit from Cizmar.  The Cizmar Affidavit states, "[a]ttached to this Affidavit is a list of damages."  The attachment to the Cizmar Affidavit indicates that Plaintiff is claiming $6,906,684 in damages – but does not explain how those damages were calculated or cite to any evidence that would support those claimed items of damage.

In response to Plaintiff's submission of that affidavit, Defendant filed a motion asking the Court to strike the Cizmar Affidavit.  (Docket Entry No. 46).  Defendant contends the Cizmar Affidavit is improper for a host of reasons, including that Plaintiff has acted in bad faith by offering unsubstantiated damages figures after the close of discovery.  Defendant notes that Plaintiff: 1) provided no damage calculations in its Rule 26 Disclosures, 2) did not produce any interrogatory responses or documents regarding damages – although Defendants requested such during discovery; and 3) has offered no calculations or explanations as to its claimed damages.

"A party seeking relief must prove damages, just as it must prove every other element of a legal claim." *Fred Avery Co.*, 99 Fed.Appx. at 592 (citing *Rodgers v. Fisher Body Div., Gen. Motors Corp.*, 739 F.2d 1101, 1107 (6th Cir. 1984) ("[D]amages must be proved; they must not be speculative.").

Here, the only evidence that Plaintiff has submitted regarding its alleged damages is the Cizmar Affidavit.

The Court agrees that the Cizmar Affidavit must be stricken, pursuant to FED. R. CIV. P. 37(c), for Plaintiff's failure to comply with its discovery obligations.

Under Rule 26, "a party must, without awaiting a discovery request," provide initial disclosures to the other parties.  Among the required Rule 26 disclosures are disclosures regarding damages:

> (iii) A computation of each category of damages claimed by the disclosing party –
> who must also make available for inspection and copying as under Rule 34 the
> documents or other evidentiary material, unless privileged or protected from
> disclosure, on which each computation is based, including materials bearing on
> the nature and extent of injuries suffered;

FED. R. CIV. P. 26(a)(1)(A)(iii).

In violation of Rule 26, Plaintiff failed to produce Rule 26 Disclosures regarding

damages to Defendant.

Plaintiff also failed properly respond to Defendant's discovery requests pertaining to

damages.  During discovery, Defendant served document requests to Plaintiff, seeking

documents regarding Plaintiff's alleged damages and Plaintiff responded as follows:

> 9.     [Produce] All documents evidencing or supporting all damages alleged in
>        the First Amended Complaint.
>
> RESPONSE: Damages are still being calculated.

(Def.'s Ex. G).  Defendant also served timely interrogatories, asking Plaintiff to describe in

detail the damages sought by Plaintiff and Plaintiff responded as follows:

> INTERROGATORY NO. 12: Describe in detail the damages you have allegedly
> sustained, including the amount of every type of actual, compensatory, liquidated
> or punitive damages for which you seek compensation in this lawsuit, stating the
> total amount of your alleged injury and how your damages were calculated.
>
> ANSWER: Those damages have not yet been calculated, and discovery is
> ongoing.

(Def.'s Ex. A-4).  Plaintiff never supplemented those discovery responses.

Pursuant to Rule 37(c), "if a party fails to provide information or identify a witness as

required by Rule 26(a) or (e), the party is not allowed to use that information or witness to

supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified

20

or is harmless."  FED. R. CIV. P. 37(c).

Here, Plaintiff's discovery failures are significant and prejudice Defendant.  Because Plaintiff did not provide any discovery as to its alleged damages during discovery, Defendant was unable to obtain discovery as to how the alleged damages were calculated or review any supporting documentation.  The failure was not harmless.

In addition, Plaintiff has not established that its failure was "substantially justified."  The only excuse offered by Plaintiff for its failure to provide any discovery regarding its alleged damages is that Plaintiff could not calculate its damages until it received a discovery response from Defendant on August 3, 2011 indicating that 12 dealerships in Michigan were terminated from 2006-2011.  That discovery response was provided by Defendant following a motion to compel filed by Plaintiff.

The Court rejects Plaintiff's excuse that it could not provide any discovery as to its claimed damages because it did not know the number of other dealerships that had been terminated by Defendant.[2]  Plaintiff could calculate the majority of its claimed damages without that information.  Moreover, Plaintiff did not supplement its discovery responses even after receiving Defendant's August 3, 2011 interrogatory response.

Given Plaintiff's significant discovery failures, the Court shall strike the Cizmar Affidavit.  Because Plaintiff has not offered any other evidence in support of its claims for monetary damages, the Court shall grant summary judgment in favor of Defendants as to

_____

[2]If Plaintiff could not calculate its damages without that information, Plaintiff would have brought that to the Court's attention in its motion to compel.  But Plaintiff's motion to compel mentioned nothing about needing the information in order to calculate damages. (See Docket Entry No. 26).  Rather, Plaintiff stated that it needed the information in order to determine if Plaintiff was treated differently than other dealers.

21

Plaintiff's claims for monetary damages.  *See Bessemer & Lake Erie Railroad Co. v. Seaway Marine Trans*. 596 F.3d 357 (6th Cir. 2010).

Accordingly, Plaintiff may not seek monetary damages at trial.

**III.    Defendant's Breach Of Contract Counterclaim**

In its Motion for Summary Judgment, Defendant contends that its proper termination of the Dealer Agreement "necessarily makes Plaintiff's unauthorized operation of a Suzuki dealership after termination unlawful as a matter of Michigan contract law."  (Def.'s Br. at 17). Defendant contends that partial summary judgment on liability in favor of Defendant is proper on its breach of contract counterclaim.

As explained above, however, the Court finds that a genuine issue of fact exists as to Plaintiff's Dealer Act claims.  Thus, Defendant is not entitled to partial summary judgment on this basis.  Accordingly, the breach of contract counterclaim shall also proceed to trial.

**IV.    Plaintiff's Jury Demand**

Plaintiff's Amended Complaint seeks a declaratory judgment as to Count I and injunctive relief under Count II.  In addition, as stated above, the Court is granting summary judgment in favor of Defendant as to Plaintiff's request for monetary damages.  Thus, Plaintiff may not seek monetary damages at trial.

"The Seventh Amendment preserves the right to trial by jury in lawsuit involving legal, not equitable, rights."  *Fred Lavery*, 99 Fed.Appx. at 592; *see also McDonald Ford Sales, Inc. v. Ford Motor Co.*, 165 Mich.App. 321, 324 (1988) ("There is no right to a jury trial where the relief sought is equitable in nature.").

Because Plaintiff's remaining claims seek only equitable relief, Plaintiff does not have

22

the right to a jury trial.  Accordingly, the Court shall strike Plaintiff's Jury demand.

## CONCLUSION & ORDER

For the reasons set forth above, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion for Summary Judgment.  The Court GRANTS the motion to the extent that the Court rules that Plaintiff cannot pursue a claim for monetary damages against Defendant. The motion is DENIED in all other respects.

IT IS FURTHER ORDERED that, because Plaintiff's remaining claims are for equitable relief only, the Court hereby STRIKES Plaintiff's jury demand.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  December 19, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 19, 2011, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager